IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEVON ROBOTICS, et al.,           :
                                  :
            Plaintiffs,           :    CIVIL ACTION
                                  :
      v.                          :    No. 09-cv-3552
                                  :
GASPAR DEVIEDMA, et al.,          :
                                  :
            Defendants.           :

### MEMORANDUM AND ORDER

**Joyner, J.**                          **November 30, 2009**

Before the Court is Defendant, Gaspar DeViedma's, Motion to Dismiss First Amended Complaint (Doc. No. 10) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and responses thereto (Doc. Nos. 18, 19, 21).  For the reasons set forth in this Memorandum, the Court grants Defendant's Motion in part and denies in part.

### I. BACKGROUND

Health Robotics, S.r.L. ("HRSRL") is an Italian company that designs, develops, markets and licences robotic medical preparation products.  Plaintiff, Devon Robotics, signed two agreements with HRSRL for the distribution of two robotic medication preparation products for hospitals and health care facilities, i.v.Station and CytoCare.  On August 22, 2008, Devon Robotics entered into an agreement with HRSRL for the exclusive

1

distribution rights of i.v.Station in North America (the "i.v.Station Agreement").  As a result of the agreement Devon Robotics became responsible for paying €675,000 upon the occurrence of four milestones.  Devon Robotics also entered into an agreement with HRSRL for the exclusive distribution rights of CytoCare in North America on September 12, 2008 (the "CytoCare Agreement").  This second contract obligated Devon Robotics to make regular license fee payments to HRSRL commencing in 2008 and continuing through 2013.  Mr. DeViedma signed these two contracts on behalf of HRSRL.  At the time these agreements were negotiated and signed, Mr. DeViedma, one of the Defendants, served as General Counsel for HRSRL.  These contracts between Devon Robotics and HRSRL contained an identical arbitration clause which requires all disputes arising from the agreement to be arbitrated in Switzerland.[1]

Plaintiffs claim that on March 1, 2009, Mr. DeViedma was hired as Devon Robotics' Chief Operating Officer ("COO").  In his position as COO, DeViedma was solely responsible for the management of sales, marketing, support and installation of CytoCare robots on Devon's behalf.  All of Devon Robotics' employees reported directly to DeViedma.  Additionally, Mr.

---

[1] "Disputes between the parties arising out of, in relation to, or in connection with this agreement or the breach thereof shall be finally settled by binding arbitration.  Any arbitration shall be conducted in English under the rules of the International Chamber of Commerce by a single, mutually-agreed-to arbitrator and shall be held in Geneva, Switzerland."  i.v.Station Agreement paragraph 33, CytoCare Agreement paragraph 29.

DeViedma served as the primary contact between Devon and HRSRL.

As part of the CytoCare Agreement between Devon Robotics and HRSRL, Devon was required to obtain an irrevocable, bank-issued letter of credit for the benefit of HRSRL for $5,000,000 as a guarantee for the payment of a portion of license fees under the CytoCare Agreement.  On November 7, 2008, Itochu issued a $5,000,000 Letter of Credit on behalf of Devon for the benefit of HRSRL.  The repayment of the letter of credit was guaranteed by Plaintiffs.  According to Plaintiffs, on March 23, 2009, while serving as Devon Robotics' COO, DeViedma advised Itochu that Devon was in default under the CytoCare Agreement for the alleged non-payment of licensing fees and that HRSRL intended to draw down the entire letter of credit to satisfy Devon's default if Devon failed to cure the default within thirty days.  On March 30, 2009, DeViedma drew down the entire $5,000,000 without the prior knowledge or consent of Devon.  DeViedma's draw down of the letter of credit prompted Itochu to demand the entire principal amount immediately from Plaintiffs.

In December 2008, Devon Robotics began negotiating a contract with McKesson Corporation, another defendant, which would give McKesson the right to distribute CytoCare within a certain territory in the United States.  DeViedma played a key role in negotiating the contract as Devon Robotics' COO.  On December 22, 2008, Devon Robotics and McKesson entered into a

Confidential Disclosure and Non-Competition Agreement prohibiting McKesson from divulging or using any confidential information for any purpose other than analyzing its deal with Devon.  After executing the agreement, McKesson engaged in extensive due diligence.  According to Plaintiffs, around March 2009, McKesson and Devon reached an oral agreement regarding the material terms of the Exclusive Distribution, Licensing, Services and Support Agreement.  The only thing that was needed to finalize the agreement was to allow McKesson's due diligence of HRSRL in Italy.  However, DeViedma, in his capacity as an officer of HRSRL, refused to permit McKesson representatives to visit Italy and complete the due diligence.

Later, after McKesson and Devon Robotics failed to come to an agreement, HRSRL terminated the CytoCare Agreement with Devon Robotics on July 30, 2009.  Then on August 10, 2009, McKesson and HRSRL entered into a five year agreement granting McKesson distribution rights with regard to CytoCare in various areas in North America which had previously been controlled by Devon Robotics.

Plaintiffs also allege that DeViedma used his position to directly communicate with actual and prospective CytoCare customers and used this communications to take business opportunities away from Devon and divert them to HRSRL.  On July 30, 2009, DeViedma wrote an email to several of Devon Robotics'

4

customers, including some of the company's largest customers,
which reflected negatively on Devon.  This email said that Devon
Robotics had laid off key employees and that Devon was facing
financial difficulties and bankruptcy.  However, DeViedma was
responsible for hiring and training personnel in his position as
COO of Devon and used that position to hire Devon Robotics
employees to work for HRSRL.  Plaintiffs also allege that
DeViedma improperly characterized several contracts regarding
i.v.Station technology as belonging to HRSRL when they actually
belonged to Devon as a result of assignments from HRSRL.
Finally, Plaintiffs claim that during DeViedma's time as Devon's
COO, he concealed some performance problems with CytoCare and
then crafted press releases which blamed Devon for the repeated
failures of the CytoCare technology.

## II. STANDARD OF REVIEW

### A.  Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a court to
dismiss a case for lack of subject matter jurisdiction.  A motion
pursuant to Rule 12(b)(1) affords the opportunity to challenge
the Court's jurisdiction both on the face of the complaint and as
a factual matter.  Common Cause of Pennsylvania v. Pennsylvania,
558 F.3d 249, 257 (3d Cir. 2009).  When considering a motion
under Rule 12(b)(1), no presumption of truthfulness attaches to

plaintiff's allegations because the issue is whether the court has power to hear the case.  <u>Mortensen v. First Federal Savings & Loan Assoc.</u>, 549 F.2d 884, 891 (3d Cir. 1977).  Additionally, a court may consider evidence outside the pleadings in reviewing a factual challenge under Rule 12(b)(1).  <u>Id.</u>; <u>Gotha v. U.S.</u>, 115 F.3d 176, 178-79 (3d Cir. 1997).

## B.   **Federal Rule of Civil Procedure 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a complaint should be dismissed if the plaintiff has failed to state a claim on which relief can be granted.  In evaluating a motion to dismiss, the court must take all well-pleaded factual allegations as true, but it is not required to blindly accept "a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 283 (1986); <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008).  Although a plaintiff is not required to plead detailed factual allegations, the complaint must include enough facts to "raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).


## III. Discussion

DeViedma's motion to dismiss is granted in part and denied in part.  Plaintiffs' claims of tortious interference with prospective contractual relations and civil conspiracy are

dismissed under Federal Rule of Civil Procedure 12(b)(6), as is Devon Health and Bennett's claim of tortious interference with current contractual relations.  All other counts are sufficient to withstand a motion to dismiss.

## A.   Federal Rule of Civil Procedure 12(b)(1)

DeViedma claims that all of Plaintiffs' claims are subject to arbitration and therefore should be dismissed by this Court under Federal Rule of Civil Procedure 12(b)(1).  Both the CytoCare contract and the i.v.Station contract contain a clear arbitration provision which requires any disputes "arising out of, in relation to, or in connection," with the contracts to be settled in arbitration under the rules of the International Chamber of Commerce in Geneva, Switzerland.

Arbitration is a matter of contract.  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  AT&T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)). Under the Federal Arbitration Act and Pennsylvania law, a district court must compel arbitration if it finds (1) that a valid arbitration agreement exists between the parties, and (2) that the dispute before it falls within the scope of this agreement.  McAlister v. Sentry Ins. Co., 958 F.2d 550, 553 (3d Cir. 1992); see 9 U.S.C. § 3.  Neither party disputes that a

7

valid arbitration agreement exists between Devon Robotics and HRSRL; however, the parties disagree as to whether the claims in this suit are within the scope of the arbitration clause.

The Supreme Court has held that a presumption of arbitrability exists where a contract contains an arbitration clause, and that an order to arbitrate should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." AT&T, 475 U.S. at 650. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003); see also Great W. Mortgage Corp. v. Peacock, 110 F.3d 222, 228 (3d Cir. 1997).

The presumption of arbitrability is particularly strong when the arbitration clause in question is broad. AT&T, 475 U.S. at 657; Brayman Constr. Corp. v. Home Ins. Co., 319 F.3d 622, 625 (3d Cir. 2003). To overcome this presumption as applied to broad arbitration agreements, a party must either establish the existence of an express provision excluding the grievance from arbitration, or provide "the most forceful evidence of a purpose to exclude the claim from arbitration." AT&T, 475 U.S. at 650 (quoting United Steelworkers of Am., 363 U.S. at 584-85).

Even where the party seeking to enforce the arbitration provision is not a signatory to the contract, federal courts have

8

enforced arbitration provisions against plaintiff signatories under an estoppel theory.  See TMG Health, Inc. v. Unitedhealth Group, Inc., No. 07-115, 2007 U.S. Dist. LEXIS 31423 (E.D. Pa. Apr. 30, 2007).  This theory is generally applies when a signatory to the written agreement must rely on the terms of the agreement to assert its claim against the non-signatory such that the signatory's claims make reference to or presume the existence of the written agreement, or the signatory's claims arise out of and relate directly to the written agreement.  When determining whether a given claim falls within the scope of an arbitration agreement, a court must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987); see also RCM Technologies, Inc. v. Brignik Technology, Inc., 137 F. Supp. 2d 550, 553 (D.N.J. 2001).

However, as this Court noted in Miron, the presumption of arbitrability has never been extended to claims by or against non-signatories.  Miron v. BDO Seidman, LLP, 342 F. Supp. 2d 324 (E.D. Pa. 2004); see, e.g., Medtronic Ave Inc. v. Cordis Corp., 367 F.3d 147 (3rd Cir. 2004) (quoting Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress International, Ltd., 1 F.3d 639, 642 (7th Cir. 1993)).  Because arbitration is a matter of contract, exceptional circumstances must apply before a court will impose a contractual agreement to arbitrate on a non-contracting party.

AT&T Tech., 475 U.S. at 650.  However, as this Court again noted in Miron, there are five established theories under which non-signatories may be bound to the arbitration agreements of others: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. Thomson-CFS v. American Arbitration Association, 64 F.3d 773, 776 (2d Cir. 1995).  Furthermore, where the party seeking enforcement of the arbitration clause is a willing non-signatory an alternative theory of reverse estoppel may apply.  Thomson-CFS, 64 F.3d at 779.

The only theory under which DeViedma may be able to enforce the arbitration clause is the alternative estoppel theory.  The alternative estoppel theory binds a signatory to arbitrate at a non-signatory's insistence where there is an obvious and close nexus between the non-signatories and the contract or the contracting parties.  E.I. DuPont, 269 F.3d at 199.  The two-part test for alternative estoppel requires a court to determine whether there is a "close relationship between the entities involved," and examine the "relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract."  E.I. DuPont, 269 F.3d at 199 (citing Thomson-CSF, 64 F.3d at 779); see also Bannett, 331 F. Supp. 2d at 360.  To satisfy the second part of the test, the non-signatory seeking enforcement of an arbitration agreement must show that the claims against them are

10

"intimately founded in and intertwined with" the underlying obligations of the contract to which they were not a party.  E.I. DuPont, 269 F.3d at 199 (citing Thomson-CSF, 64 F.3d at 779).

The essential question in situations such as these is whether plaintiffs would have an independent right to recover against the non-signatory defendants even if the contract containing the arbitration clause were void.  "The plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel."  Price Plaintiffs v. Humana Ins. Co., 285 F.3d 971, 976 (11th Cir. 2002) (rev'd on other grounds, PacifiCare Health Sys. v. Book, 538 U.S. 401 (2002)). In In re Humana, the Eleventh Circuit held that equitable estoppel was inappropriate where plaintiffs brought a RICO suit against a non-signatory defendant, because the RICO claims were based on a statutory remedy apart from any available remedy for breach of the underlying contract. In re Humana, 285 F.3d at 976.

### 1.  Breach of Fiduciary Duty

It is not proper to dismiss this claim in favor of arbitration because the breach of fiduciary duty claim does not arise out of the various agreements between Devon Robotics and HRSRL.  Mr. DeViedma's fiduciary duties to Devon arose out of his position as COO of Devon Robotics.  Plaintiffs also provided

evidence that Mr. DeViedma's own email signature stated he was acting as Devon Robotics's COO.  Even if DeViedma's role as COO was created via the various agreements between Devon Robotics and HRSRL, the fiduciary duty he owed to Devon Robotics was not due to the contracts.  DeViedma owed Devon Robotics fiduciary duties by virtue of his position as COO and independent of any obligations he may have had under the agreements.  This Court has jurisdiction over the breach of fiduciary duty claim because it is not within the scope of the agreements containing the arbitration clause; therefore, DeViedma's Motion to Dismiss Count IV pursuant to Rule 12(b)(1) is denied.

**2.  Tortious Interference with Current and Prospective Contractual Relations**

Plaintiffs' claim of tortious interference with current and prospective contractual relations is not subject to the arbitration clauses in the various agreements between Devon Robotics and HRSRL.  Count V of Plaintiffs claim is based on DeViedma's alleged interference with various validation contracts.  These contracts are not intimately intertwined with the i.v.Station and CytoCare agreements.  Although the validation contracts deal with the same equipment, the terms of those contracts and the law governing DeViedma's behavior regarding those contracts is independent of the agreements. This Court has jurisdiction over the breach of fiduciary duty claim because it

is not within the scope of the agreements containing the
arbitration clause; therefore, DeViedma's Motion to Dismiss Count
V pursuant to Rule 12(b)(1) is denied.

### 3.  Defamation

Plaintiffs' claim of defamation is not subject to the
arbitration clauses in the various agreements between Devon
Robotics and HRSRL.  Plaintiffs have alleged that DeViedma
maliciously sent an email to their customers containing false
information regarding their financial situation which placed them
in a negative light.  Plaintiffs claim that the email suggested
Devon Robotics was entering bankruptcy and that Devon's
reputation with its clients was damaged.  This Court has
jurisdiction over the defamation claim because it is not within
the scope of the agreements containing the arbitration clause;
therefore, the Court denies DeViedma's Motion to Dismiss Count VI
pursuant to Rule 12(b)(1).

### 4.  Conspiracy

To the extent that Plaintiffs' claim of conspiracy is based
on the termination of the CytoCare agreement, their claim is
dismissed.  Plaintiffs' Complaint alleges that the Defendants
conspired to wrongfully terminate the CytoCare agreement.  The
determination as to whether the agreement was wrongfully
terminated will be intimately related to the terms of the
agreement.  Additionally, there is an extremely close nexus

between the non-signatory parties and Devon Robotics.   Therefore,
the Court lacks subject matter jurisdiction over the claim and
any claim of conspiracy based on the termination of the CytoCare
agreement should be pursued via the arbitration clause in the
CytoCare Agreement.   See infa Section B(5).   This claim seems to
be an attempt to avoid the arbitration clause in the CytoCare
agreement; therefore, to the extent that Plaintiffs' claim is
based on the termination of the CytoCare agreement, it is
dismissed in favor of arbitration.

## B.   Federal Rule of Civil Procedure 12(b)(6)

### 1.   Gist of the Action Doctrine

None of Plaintiffs claims are barred by the Gist of the
Action Doctrine.   In Pennsylvania, the "Gist of the Action"
doctrine prevents parties to a contract from asserting claims of
fraud when the fraud claims stem from the obligations imposed by
the contract.   Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d
710, 719 (Pa. Super. Ct. 2005).[2]   The doctrine is designed to
maintain the distinction between breach of contract claims and
tort claims and to preclude plaintiffs from recasting ordinary
breach of contract claims into tort claims.   Etoll, Inc. v.

---

[2] Although the Pennsylvania Supreme Court has never adopted the "Gist of
the Action" Doctrine, both the Pennsylvania Superior Court and a number of
United States District Courts have followed the doctrine.   See, e.g., Etoll,
Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002);
Bash v. Bell Tel. Co. of Pennsylvania, 601 A.2d 825 (Pa. Super. Ct. 1992);
Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc., 123 F. Supp. 2d 826,
833 n. 11 (E.D. Pa. 2000).

Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002).
Tort actions lie for breaches of duties imposed by law as a
matter of social policy, while contract actions lie only for
breaches of duties imposed by mutual consensus agreements between
particular individuals.  Bash v. Bell Tel. Co., 601 A.2d 825, 829
(Pa. Super. Ct. 1992); see Cottman Transmission Systems v.
Kershner, 536 F. Supp. 2d 543, 555-56 (E.D. Pa. 2008).  "In other
words, a claim should be limited to a contract claim when the
parties' obligations are defined by the terms of the contract,
and not by the larger social policies embodied in the law of
torts."  Bash v. Bell Tel. Co., 601 A.2d at 830.

Since the parties at issue here are not the parties which
signed the CytoCare and i.v.Station Agreements, Plaintiffs'
claims are not barred by the Gist of the Action Doctrine.
Plaintiffs' claims arise from duties and facts which are
independent of any claims related to the breach of the
i.v.Station and CytoCare agreements.  Therefore, the Court
declines to dismiss any of the claims based on this doctrine.

**2.  Count IV - Breach of Fiduciary Duty**

The Court declines to dismiss the breach of fiduciary duty
claim against Mr. DeViedma because Plaintiffs have adequately
stated a claim for breach of fiduciary duty.  Under Pennsylvania
law, a corporation's officers and directors owe the corporation
fiduciary duties.  Higgins v. Shenango Pottery Co., 256 F.2d 504,

507-08 (3d Cir. 1958).  Plaintiffs allege that DeViedma served as
COO of Devon and had a large amount of responsibility for Devon's
affairs.  Plaintiffs also provide evidence that Mr. DeViedma's
own email signature stated he was acting as Devon Robotics's COO.
At the motion to dismiss phase, this is a sufficient factual
basis to establish the existence of a fiduciary relationship.
Therefore, Defendant's Motion to Dismiss Count IV is denied.

### 3.  Count V - Tortious Interference with Current and Prospective Contractual Relations

#### a.  Tortious Interference with Current Contractual Relations

Plaintiffs have adequately pled a claim for tortious
interference with current contractual relations.  Under
Pennsylvania law, in order to prove tortious interference with
existing contractual relations plaintiff must prove the
following: (1) existence of a contractual relation between the
claimant and a third party; (2) purposeful action on the part of
the defendant specifically intended to harm the existing
relation; (3) the absence of a privilege or justification for
doing so; and (4) actual legal damage as a result of defendant's
conduct.  Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140
F.3d 494, 530 (3d Cir. 1998); Pelagatti v. Cohen, 536 A.2d 1337,
1343 (Pa. 1988); Thompson Coal Co. v. Pike Coal Co., 412 A.2d
466, 471 (Pa. 1979).

16

Devon Robotics has pled that it had several validation contracts with different hospitals, that DeViedma purposefully interfered with those contracts for his own benefit, without justification, and that as a result, Devon lost substantial amounts of business.  These pleadings are sufficient to establish a claim for tortious interference with existing contractual relations.  Devon Robotics specifically named several validation contracts it had with its clients.  It also alleges that DeViedma took actions designed to hurt Devon Robotics' relationships with its current and prospective customers.  Finally, Devon Robotics sufficiently alleges that it suffered damages, like the loss of the various contracts.  Therefore, this Court declines to dismiss Devon Robotics' claim of tortious interference with existing contractual relations against DeViedma.

However, Devon Health and Bennett's claim of tortious interference with current contractual relations is dismissed because these Plaintiffs have alleged no facts which would support their claim.  All of the facts alleged in the Complaint pertain to contracts which were held by Devon Robotics.  Therefore, DeViedma's Motion to Dismiss Devon Health and Bennett's claim of tortious interference with existing contractual relations is granted.

### b.  Tortious Interference with Prospective Contractual Relations

17

Additionally, Plaintiffs' claim for tortious interference with prospective contractual relations is dismissed to the extent that the claim is based on the validation contracts. Pennsylvania distinguishes between claims for interference with existing contractual relations and claims for interference with prospective contractual relations. Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 470-71 (1979). In addition to the elements necessary to establish a claim for tortious interference with current contractual relations, a claim of tortious interference with prospective contractual relations requires a showing of the existence of prospective contracts. Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1014 (3d Cir. 1993). In determining whether there is a prospective contractual relationship in a tortious interference case, Pennsylvania courts consider whether the evidence supports a finding that there was a reasonable likelihood that the contemplated contract would have materialized absent the defendant's interference. Glenn v. Point Park Coll., 272 A.2d 895, 898-99 (Pa. 1971). Additionally, a plaintiff must base its claim that there was a prospective contractual relationship on something other than an existing or current relationship. Phillips v. Selig, 959 A.2d 420, 429 (Pa. Super. Ct. 2008).

Plaintiffs have based their claim solely on the existence of various validation contracts. They offer no evidence regarding

18

any potential contracts which were interfered with by DeViedma.
The only specific contract Plaintiffs cite is one that Devon
Robotics was negotiating with McKesson.  However, no part of
their tortious interference with prospective contractual
relations claim references this situation as the basis of their
claim.  Therefore, Plaintiffs' tortious interference with
prospective contractual relations claim is dismissed.[3]

### 4.  Count VI - Defamation

Plaintiffs have adequately pled a claim of defamation. Under
Pennsylvania law, in order to establish a claim for defamation,
plaintiff must allege the following elements: (1) a defamatory
communication; (2) publication of the defamatory communication by
the defendant; (3) the communication's application to the
plaintiff; (4) an understanding by the reader or listener of the
statement's defamatory meaning; and (5) an understanding by the
reader or listener that the statements refer to plaintiff.
Tucker v. Fishbein, 237 F.2d 275, 281 (3d Cir. 2001).

However, under Pennsylvania law, a publisher of defamatory
material is not liable if the publication was made subject to a
privilege and the privilege was not abused.  Chicarella v.
Passant, 494 A.2d 1109, 1112 (Pa. Super. Ct. 1985).  When the
publication is actuated by malice, is made for a purpose other

---

[3] This Court grants Plaintiffs leave to amend their tortious
interference with prospective contractual relations to include any claims
related to the McKesson negotiations.

19

than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose, the privilege is lost. Miketic v. Baron, 675 A.2d 324, 329 (Pa. 1996) (quoting Beckman v. Dunn, 419 A.2d 583, 588 (Pa. 1980)). Additionally, in Pennsylvania truth is an absolute defense to a defamation claim and a defendant need only show substantial, rather than complete, truth. Bobb v. Kraybill, 511 A.2d 1379, 1380 (Pa. 1986). Mere negligence as to falsity is not sufficient to amount to abuse of a conditional privilege. Instead, knowledge or reckless disregard as to falsity is necessary for this purpose. Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974). The defendant bears the burden of showing the truth of the defamatory communication, the privileged nature of the communication, or that the communication touched on a matter of public concern. 42 Pa. Cons. Stat. Ann. § 8343(b).

Under Pennsylvania law, a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Marcone v. Penthouse Intern. Magazine for Men, 754 F.2d 1072, 1081 (3d Cir. 1985) (citing Corabi, 273 A.2d at 904). The threshold determination of whether a statement is capable of defamatory meaning depends on the

general tendency of the words to have such an effect; no
demonstration of any actual harm to reputation is necessary.  Id.
Publication of a defamatory statement requires that the
information be communicated to at least one person other than the
person defamed.  Flaxman v. Burnett, 574 A.2d 1061, 1066 (Pa.
1990).

Plaintiffs have alleged that DeViedma maliciously sent an
email containing false information which placed them in a
negative light.  Plaintiffs claim that the email suggested Devon
Robotics was entering bankruptcy and that Devon's reputation was
damaged with it clients.  At the motion to dismiss phase, it is
sufficient that Plaintiffs have alleged these facts regarding the
July 30, 2009 email from DeViedma.  Additionally, the Court
declines to dismiss the defamation claim as to Bennett and Devon
Health because the statements made by DeViedma could reasonably
be found to have had a defamatory effect on those Plaintiffs,
despite the fact that they were not mentioned by name in the
alleged defamatory statement.  Under Pennsylvania law, a
plaintiff does not need to be specifically identified in a
defamatory statement to recover under a theory of defamation.
Farrell v. Triangle Pub., 159 A.2d 734, 737 (Pa. 1960).
Therefore, DeViedma's motion to dismiss Count VI is denied.

## 5.  Count VII - Conspiracy

We recognize that Plaintiffs could allege a claim of

conspiracy that does not fall under the arbitration clause;
therefore this court will also analyze Plaintiffs' conspiracy
claim under Rule 12(b)(6) despite having dismissed the claim to
the extent it dealt with the CytoCare Agreement.  Under
Pennsylvania law, in order to establish a claim for civil
conspiracy, plaintiff must allege facts which if proven would
show: (1) a combination of two or more persons acting with a
common purpose to do an unlawful act or to do a lawful act by
unlawful means or for an unlawful purpose; (2) an overt act done
in pursuance of the common purpose; and (3) actual legal damage.
McGreevey v. Stroup, 413 F.3d 359, 371 (3d Cir. 2005).  A claim
for civil conspiracy also requires the plaintiff to allege an
underlying tort.  Id. (citing Boyanowski v. Capital Area
Intermediate Unit, 215 F.3d 396, 405 (3d Cir.2000)).  "Since
liability for civil conspiracy depends on performance of some
underlying tortious act, the conspiracy is not independently
actionable; rather, it is a means for establishing vicarious
liability for the underlying tort."  Boyanowski v. Capital Area
Intermediate Unit, 215 F.3d 396, 406 (3d Cir.2000) (citing
Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983)).

Plaintiffs' allegations of civil conspiracy focus on the
alleged improper termination of the CytoCare agreement between
Devon Robotics and HRSRL.  Since Plaintiffs have not alleged any
underlying tortious conduct in their Complaint which would give

22

rise to a claim of conspiracy, the claim against DeViedma must be dismissed.[4]

### 6.  Count VIII – Injunctive Relief

Plaintiffs have requested preliminary and permanent injunctive relief.  Defendants argue that Plaintiffs have not made a sufficient showing to justify injunctive relief. Plaintiffs contend that the CytoCare and i.v.Station agreements between Devon Robotics and HRSRL entitle them to injunctive relief or in the alternative that they have alleged a sufficient factual basis which entitle them to injunctive relief.  This Court declines to issue a preliminary injunction, but will consider issuing a permanent injunction should it later be proven that one is appropriate in this case.

To establish the right to relief through a preliminary injunction, the moving party must show the following: (1) success on the merits is likely; (2) irreparable injury will result if injunctive relief is denied; (3) granting the preliminary injunction will not cause greater harm to the non-movant; and (4) public interest favors injunctive relief.  Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006) (citing Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004)).  The standard for granting a

---

[4] Although the Court granted leave to amend the tortious interference claim and Plaintiffs may choose to attempt to amend their conspiracy claim, it should be noted that the Court likely lacks jurisdiction over any underlying torts asserted in support of the conspiracy claim based on the CytoCare or i.v.Station agreements due to the arbitration clauses in the agreements.  See supra Section A(4).

permanent injunction differs from the standard governing a
preliminary injunction.  American v. Civil Liberties Union of New
Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471,
1477 (3d Cir. 1996)).  A court may grant a permanent injunction
where the moving party has shown: (1) jurisdiction is
appropriate; (2) the movant "has actually succeeded on the
merits" of his claim; and (3) balancing equities favors granting
injunctive relief.  Chao v. Rothermel, 327 F.3d 223, 228 (3d Cir.
2003).

Plaintiffs' request for a preliminary injunction is denied.
Injunctive relief is an extraordinary remedy and is only granted
in limited circumstances.  Plaintiffs have failed to show they
will suffer irreparable harm without a preliminary injunction.
Plaintiffs allege only that they will suffer injury to their
reputation and potential contract breaches.  Neither of these
speculative injuries rises to the level of irreparable harm.
Additionally, the various agreements between HRSRL and Devon
Robotics do not entitle Plaintiffs to an injunction as they do
not govern any of the remaining claims in this case.

As to Plaintiffs' request for permanent injunctive relief,
this is relief that the Court may consider if Plaintiffs succeed
on the merits.  Since this would occur at the end of litigation,
it is inappropriate for the Court to limit the remedies available
to Plaintiffs at this time; therefore Defendant's motion to

dismiss the claim for permanent injunctive relief is denied.

## IV. Conclusion

Plaintiffs' claims of tortious interference with prospective contractual relations and conspiracy are dismissed, as is Devon Health and Bennett's claim of tortious interference with current contractual relations.  The remainder of DeViedma's Motion to Dismiss is denied.