**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DEVON ROBOTICS, et al.,          :
                                 :
              Plaintiffs,         :    CIVIL ACTION
                                 :
     v.                           :    No. 09-cv-3552
                                 :
GASPAR DEVIEDMA, et al.,          :
                                 :
              Defendants.         :

<u>**MEMORANDUM AND ORDER**</u>

**Joyner, C.J.**                        **August 23, 2012**

     This action is presently before the Court for disposition of
Defendant Gaspar DeViedma's Motion for Summary Judgment (Doc.
Nos. 81, 82 and 84), Defendant McKesson Corporation's Motion for
Summary Judgment (Doc. No. 83) and Plaintiffs' Motion for Partial
Summary Judgment Against Defendant McKesson Corporation (Doc. No.
85). For the reasons set forth in this Memorandum, the Court
grants Defendant DeViedma's Motion for Summary Judgment in part
and denies the Motion in part; grants Defendant McKesson's Motion
for Summary Judgment in part and denies the Motion in part; and
denies Plaintiffs' Motion for Partial Summary Judgment.

<u>**FACTUAL BACKGROUND**</u>

     This case revolves around the entities seeking financial
gain through the sale and distribution of two robotics medication
preparation devices, both created by Health Robotics, S.r.l.

("HRSRL")—CytoCare and i.v. Station.[1] In August and September 2008, Devon Robotics acquired the rights to distribute these robotic devices in the North American market. We previously detailed the history surrounding this acquisition in Case Nos. 09-CV-1819 and 09-CV-4123, and incorporate this background by reference.

The present action involves the claims of Plaintiffs Devon Health Services ("DHS"), Devon Robotics, and Dr. John Bennett, the CEO of both entities (collectively "Devon") against Defendant Gaspar DeViedma ("DeViedma") and Defendant McKesson Corporation ("McKesson").

### (1) Devon's Payment Obligations under the CytoCare Distribution Agreement

Devon Robotics and HRSRL executed the CytoCare Distribution Agreement on September 12, 2008. DeViedma Mot. Ex. 5, Doc. No. 82. Under its terms, Devon Robotics agreed to pay "CytoCare License Fees" to HRSRL, defined as "the firm, guaranteed, and binding payment" of €15,232,988 "in consideration for the exclusivity for the Licensor Product from the Effective Date through the end of the Initial Exclusive Term." Id. at ¶ 1.2; ¶ 3.1.[2] The Distribution Agreement outlined the schedule of monthly fees due to HRSRL, starting in October 2008. Id. at ¶ 3.10.

---

[1] "CytoCare" is a robotic device that prepares cytotoxic medications. The other robot, "i.v. Station," prepares non-toxic medications more commonly used in hospitals.

[2] Effective date meant September 15, 2008. Id. at ¶ 1.10. Initial Exclusive Term lasted until December 31, 2012 unless parties invoked procedures provided for earlier termination. Id. at ¶ 1.23.

The parties acknowledged that customer sales would significantly trail the License Fees payment schedule. Id. at ¶ 3.2. The Agreement could be terminated if either party failed to cure a material breach within thirty days of notice from the non-breaching party. Failure to comply with the obligations of ¶ 3.10, outlining the required licensing fees, constituted a material breach of the Agreement. Id. at ¶ 11.

Devon Robotics also agreed to a "Payment Guarantee," which required a $5 million "irrevocable, bank-issued standby Letter of Credit...provided no later than thirty (30) days after [September 15, 2008]...as a guarantee by [Devon] of the future full payment of the CytoCare License Fees in consideration for the grant of exclusivity." Id. at ¶ 1.33; ¶ 3.9.[3] "The format of the Payment Guarantee" was to "be as described in Schedule 9." Id. at ¶ 1.33. This attached Schedule provides a drafted example of the imagined "bank payment guarantee" to be made at the request of Devon Robotics. The suggested language states that the bank would:

> irrevocably and unconditionally undertake to pay [HRSRL] at first written demand, irrespective of the validity and the legal effects of the underlying Agreement and waiving all rights of objection and deference arising from said Agreement any amount not exceeding USD five-million ($5,000,000) upon receipt of your written confirmation that Devon Robotics LLC has failed to fulfill its contracting obligations 'failing to purchase and consequently missing full payment of any and/or all of the stipulated 'CytoCare License Fees' and therefore you [HRSRL] are entitled to claim payment for the amount requested under this guarantee. Id. at Sch. 9.

---

[3] Schedule 9 to the initial Agreement and then Schedule 11 to the First Amendment both provide drafted language for this Letter of Credit that includes the procedures imagined by which HRSRL could access these funds in the event that Devon Robotics failed to perform as agreed.

This contemplated bank guarantee was to be "governed and construed in accordance with Italian law, with place of jurisdiction as Bolzano, Italy." Id.

However, the parties never executed a bank payment guarantee that included this precise language or contained this choice-of-law provision. Instead, on November 5, 2008, Devon executed a Guaranty Agreement with Itochu International, Inc. ("Itochu"), which was explicitly governed by New York law.[4] DeViedma Mot. Exs. 6-8. This Guaranty Agreement is the only document in the record actually executed to extend the $5 million line of credit to HRSRL on Devon's behalf. Under the terms of this Guaranty Agreement, Devon "unconditionally guarantee[d]" to "duly and punctually" repay Itochu if HRSRL "properly effect[ed] a draw on the [$5 million] Letter of Credit for any reason other than the impending non-renewal of the Letter of Credit prior to January 15, 2013 upon the expiration of any then-current term." Id.

### (2) The Confidential Disclosure and Non-Competition Agreement Between McKesson and Devon Robotics

Late in 2008, Devon Robotics began negotiations with McKesson about a possible sublicense of a portion of the rights Devon Robotics held under the CytoCare Distribution Agreement with HRSRL. These negotiations led to a Confidential Disclosure

---

[4] Itochu is an entity that Devon negotiated with regarding the robotic device investment venture and a separate deal for a share purchase in DHS. The disputes between Devon and Itochu are the subject of the related Opinion in Case Nos. 09-CV-1819 and 09-CV-4123.

and Non-Competition Agreement (hereinafter the "NDA"), which was executed by McKesson and Devon Robotics on December 22, 2008. <u>See</u> Devon Mot. Ex. B at MCK151667-70, Doc No. 85. This agreement barred McKesson from divulging or using any confidential information shared by Devon Robotics for any purpose other than analyzing a possible deal between the parties. The NDA broadly defines "confidential information" to include:

> trade secrets; conceptions; inventions; developments; intellectual property rights including patent applications, copyrights and trademarks; know-how; processes; technical data; specifications; proprietary market data; internal costs; supplier costs; pricing; contractual relationships; business methods; financial data; business projections; market and corporate strategies; and/or other proprietary information. NDA at ¶ 1.

The parties agreed that this obligation would last for one year and would survive the termination of the NDA for a period of three years.

After executing the NDA, Devon Robotics revealed proprietary information to McKesson, including marketing plans, business opportunities, and potential customers. McKesson confirms that much of this information was isolated and stored on a SharePoint website. The SharePoint website was designated "Project Derby," the code name assigned to the Devon Robotics deal. It remains unclear precisely what information was stored on this site.

### (3) DeViedma Assumes Role of Chief Operating Officer of Devon Robotics

From December 2008 until the summer of 2009, McKesson and Devon Robotics engaged in negotiations and proceeded with due

diligence. On February 13, 2009, Bennett informed McKesson that Gaspar DeViedma had assumed the position of Chief Operating Officer (COO) at Devon Robotics and that McKesson should contact DeViedma in negotiating the partnership arrangement between the companies. See Devon Mot. Ex. C at Devon0138923.

DeViedma was general counsel for HRSRL, and in this capacity had negotiated Devon Robotics' distribution contracts for both CytoCare and i.v. Station robots. By February 2009, CytoCare robot sales were not performing as hoped. In order to help remedy poor sales performance, Devon Robotics brought in DeViedma, who had a great deal of experience marketing products in the medical automation field.

The morning of February 14, 2009, DeViedma sent an email to the staff of Devon Robotics, among others, entitled "First Communication from the Office of the COO, Devon Robotics." Resp. Ex. G at Itochu0027432-34. The email explains that in accord with Bennett's plans for the company, DeViedma was assuming the position of COO. According to DeViedma:

> Dr. Bennett decided a few weeks back to institute the Office of the COO reporting to him directly. I will fill this office effective immediately but will share it with Werner Rainer [CEO of HRSRL] who will temporarily be moving to the United States to help with the challenges and opportunities the company faces. Between my time and Werner's we feel confident that we will spend sufficient time in the United States to provide a new fresh start for the company, and to provide Dr. Bennett with an infrastructure he can build around for the future. Dr. Bennett may indeed institute further changes to this Office of the COO or other responsibilities within the company. I will temporarily reside in Philadelphia and Werner will take temporary residence

6

in San Francisco for this purpose and we will share these duties with other global duties we owe to [HRSRL]'s shareholders. <u>Id</u>. After assuming responsibility for supervising the sales team members and implementing new strategies to improve outcomes, DeViedma closed the email by stating: "Look forward to seeing you on the 24th and to help return the stockholders in Itochu and Devon the results they deserve." <u>Id</u>.

Apparently it was DeViedma who suggested the title of "Chief Operating Officer" instead of "President" when the two first discussed plans for DeViedma to take greater control of Devon Robotics. Bennett testified that DeViedma "needed to have all authority for all actions on the basis of the company." Pl. Resp. Ex. F. at 370:20-372:20, 396:16-397:10.

### (4) The Second Amendment to the CytoCare Distribution Agreement

According to Devon, the Second Amendment was "the vehicle through which DeViedma was officially brought on as the Chief Operating Officer ("COO") of Devon Robotics around mid-February 2009." Resp. at 3, Doc. No. 90. However, we note that by its own terms the Second Amendment became effective March 1, 2009. <u>Id</u>. at Ex. E. The Second Amendment provides:

> [Devon Robotics] hereby retains [HRSRL] and [HRSRL] hereby agrees to provide executive management consulting services to [Devon Robotics]. The services to be provided... shall be performed by Mr. Werner Rainer and by Mr. Gaspar DeViedma... <u>Id</u>. at § 40.1.

Under the terms of the Second Amendment, HRSRL undertook "overall executive management duties for Devon

7

Robotics...including sales, marketing, installation, and support"
and agreed to "report directly to the CEO, Devon International
Group." Id. at § 40.5. Furthermore, "[a]ll Devon Robotics LLC and
ITOCHU Med/Surg employees" were to report to HRSRL. Id. The
provision of "executive management consulting services" was to
last one year, renewable only with mutual written agreement
between the parties. Id. at § 40.2. Either party could cancel the
Second Amendment, and thus the provision of these services, for
any reason, by giving 60 days written notice. Id. DeViedma was to
reside within the United States at his own expense for a minimum
of nine months and to devote a minimum of 220 days per year to
this work. Id. at §§ 40.3, 40.4.

The Second Amendment did not establish a salary for DeViedma
directly, but did provide that Devon Robotics would pay $250,000
to HRSRL annually for executive management consulting services.
Id. at § 40.6. Devon Robotics also agreed to reimburse HRSRL for
all reasonable direct travel and living expenses within the
United States, though HRSRL remained responsible for travel and
living expenses outside of this territory. Id. at § 40.7. These
comprised the "sole and exclusive compensation for rendering
executive consulting services to [Devon Robotics]." Id. at §
40.9. The parties dispute whether DeViedma agreed to non-payment
of "consulting fees," but agree that Devon Robotics provided
DeViedma and his family with health benefits.

Finally, the Second Amendment included a restatement of the CytoCare Distribution Agreement's obligations:

> There are no other modifications to the Agreement. All terms and conditions of the Agreement not amended by this Second Amendment shall remain unaltered and in full force and effect. To the extent there is any conflict between the Agreement and the Second Amendment, the Second Amendment shall prevail. This Second Amendment may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Id. at ¶ 2.

Rainer signed on behalf of HRSRL; Bennett signed on behalf of Devon Robotics. DeViedma did not sign this document, individually or on behalf of HRSRL.

### (5) DeViedma's Role in the McKesson Negotiations

While DeViedma strongly contests that he owed a fiduciary duty to Devon Robotics, all agree that he worked on behalf of the company and oversaw various affairs.[5] Among these and acting as COO, DeViedma played a key role in the negotiations with McKesson.

By March 5, 2009, only two tasks remained outstanding in finalizing the deal between McKesson and Devon Robotics: drafting the definitive agreement and completing due diligence. According to Ben Sperling, the Director of Strategic Business Development at McKesson Automation and an executive engaged in negotiating on McKesson's behalf, DeViedma was the individual "obstructing McKesson's ability to complete the FDA due diligence trip to Italy" while making it "seem like [Bennett] was not happy" and

---

[5] We detail DeViedma's actions as COO in our analysis of Devon's breach of fiduciary duty claim, see infra at Part II(B).

9

therefore instructing DeViedma to prevent the visit. <u>See</u> Resp. Ex. P at 107:6-108:18. David Souerwine, the President of McKesson Provider Technologies and another executive negotiating on behalf of McKesson, also believed that, as of March 26, 2009, there was a deal between Devon Robotics and McKesson, and that the only "stumbling block" was DeViedma, who "was blocking [McKesson] from going to do the FDA diligence." <u>See</u> Resp. Ex. Q at 164:15-22, 183:6-185:3, 190:15-25.

According to McKesson, the company remained prepared to go through with the deal in early May 2009. Yet, DeViedma, while acting as COO, continued to stall McKesson's FDA due diligence observations of HRSRL's manufacturing facilities in Italy. On May 7, 2009, Souerwine wrote to Bennett, informing him that McKesson was "blocked earlier from completing the FDA due diligence" and still looking to schedule this trip. Resp. Ex. D at Devon0150386-87. When Bennett informed DeViedma of this, DeViedma responded:

> I am sorry [Bennett] but I am not going to agree to schedule the trip without a contract signed contingencies ok we have wasted enough time with other people and I will not distract Paolo. When I blocked the trip I meant it and there is absolutely nothing that will make me change my mind even you telling him he can schedule it. No contract no trip, sorry. <u>Id</u>.

Bennett told DeViedma that he thought this was the "wrong coarse [sic]" but would abide by the decision. <u>Id</u>. Despite continued efforts to negotiate the deal, McKesson and Devon Robotics never entered into an agreement for the sublicense of the rights to CytoCare.

### *(6)  The Draw-Down of the $5 Million Line of Credit*

On March 22, 2009, HRSRL notified Devon Robotics that it had materially breached the CytoCare Distribution Agreement by its "failure to pay within 30 days [HRSRL]'s Invoice for the February Franchise Fees in the amount of €219,951." See DeViedma Mot. Ex. 26. HRSRL instructed Devon that it had thirty days in which to cure this material breach, and that HRSRL "ha[d] elected, as the CytoCare Agreement permits, to call-in the Payment Guarantee described in Section 3.9 that Itochu International provided to [HRSRL]." Id. Rainer, on behalf of HRSRL, went on to further state:

> We understand that said material breach comes as a result of funding disagreements with Itochu International. If these agreements are resolved within the 30-day cure period and the material breach is cured, we welcome a new agreement with Devon whereby the Payment Guarantee may be returned to Itochu International in consideration for the Issuance of a new Letter of Credit for the duration of the Term of the Agreement. If the material breach is not cured within the 30-day period, the Agreement shall be terminated for cause, and we may offer Devon and Itochu the possibility of executing a new Agreement within 30 days of termination. Id.

On or around March 31, 2009, HRSRL drew down the letter of credit in full, thereby immediately receiving $5 million. DeViedma Mot. Ex. 27. Shortly thereafter Itochu demanded Devon's payment of the full $5 million per the conditions of the November 5, 2008 Guaranty Agreement. Then on April 10, 2009, Itochu initiated litigation in federal court to recoup this amount, as well as an outstanding $4 million Itochu had loaned directly to Devon.

11

**(7)** *End of DeViedma's Tenure as COO and the Fourth Amendment to the CytoCare Distribution Agreement*

On June 5, 2009, DeViedma stopped serving as the COO of Devon Robotics. Several days later, HRSRL again advised Devon Robotics that the company was in material breach of the CytoCare Distribution Agreement for failure to pay franchise fees. Devon Robotics tried to resolve this situation, and hoped that cementing a deal with McKesson would also lead to a deal with HRSRL.

HRSRL and Devon Robotics executed a Fourth Amendment to the CytoCare Distribution Agreement on June 15, 2009, which rescinded Section 40 of the Second Amendment and clarified that the "executive management consulting services" had been terminated effective June 5, 2009. DeViedma Mot. Ex. 11. This time, DeViedma signed on behalf of HRSRL.

There is substantial evidence to show that the relationship between DeViedma and Bennett increased in hostility by July 2009. See, e.g., Resp. Ex. M at GDV00832-35.

**(8)** *Second Legal Notice of Material Breach of CytoCare Distribution Agreement*

On June 8, 2009, HRSRL sent Devon a "Second Legal Notice of Material Breach" for the failure to cure its previous breach and to pay the outstanding February Franchise Fees in the amount of €219,951. DeViedma Mot. Ex. 40. In addition, this notice claimed that Devon now owed an additional €733,777 for the outstanding

March, April and May Franchise Fees. Id. According to this
notice, "the call-in of the Letter of Credit [did] not relieve
Devon from making guaranteed payments for Franchise fees." Id.

### (9) Development of CytoCare Distribution Agreement Directly Between HRSRL and McKesson

At the end of June, McKesson learned that Devon was
embroiled in undisclosed lawsuits with Itochu. McKesson Mot. Ex.
C-8. The pleadings in these lawsuits revealed, inter alia, that
Devon believed that its "ability to meet its financial
obligations, including payment of license fees to [HRSRL]" was
compromised and that its "financial viability was imperiled."
Bennett, et al. v. Itochu International Inc., et al., E.D. Pa.
09-CV-1819, Doc. No. 1 at ¶ 93.

On July 13, 2009, DeViedma sent Souerwine an unsolicited
"Advanced Courtesy Notification of Health Robotics Press Release"
stating that HRSRL planned to take steps to protect its
customers' interests, including, "if necessary, terminating for
cause some of [HRSRL]'s indirect distribution agreements with
companies that might be unwilling or unable to adequately
support...customers." McKesson Mot. Ex. C-10 at MCK169361. The
notice also divulged to the public that there was "pending
litigation between one of [HRSRL]'s distributors and its capital
founders." Id.[6] Around this time, DeViedma floated the idea of a

---

[6] We detail McKesson's reply communications with DeViedma in our analysis of
Devon's tortious interference with current contractual relations claim, see
infra at Part IV(A).

direct deal with McKesson for the CytoCare distribution rights in North America, indicating that Devon Robotics' distribution rights would most likely be terminated in the near future.

On July 25, 2009, HRSRL terminated its CytoCare Distribution Agreement with Devon Robotics. See McKesson Mot. Ex. B-15. According to the termination letter, authored by DeViedma as HRSRL's general counsel, Devon Robotics owed in excess of €17 million under the CytoCare contract, which it remained obligated to pay. Id. The letter details many alleged causes for the termination, including Devon Robotics' failure to pay monthly franchise fees. Id. Less than two weeks later, on August 7, 2009, HRSRL entered into a direct distribution agreement with McKesson.

### (10) Termination of the i.v. Station Distribution Agreement

On July 28, 2009, HRSRL sent Devon a "Legal Notice of Material Breach," detailing several alleged breaches of the i.v. Station Distribution Agreement, including, *inter alia*, the "malicious" disclosure of "trade secrets to third parties." DeViedma Mot. Ex. 41. The letter detailed the actions Devon must take to remedy the breaches in the thirty-day cure period, including making an immediate €1 million payment to HRSRL and placing €5 million in escrow with HRSRL as the beneficiary. Id.

On July 30, 2009, DeViedma authored a long email to several of Devon Robotics' hospital customers painting Bennett and Devon Robotics in a negative light. Resp. Ex. G at Itochu0086297-300.

14

In this email, DeViedma told customers that Devon Robotics faced "financial difficulties" and bankruptcy proceedings and lacked staff qualified to manage i.v. Station robot installations.

Then, on September 16, 2009, HRSRL terminated the i.v. Station Distribution Agreement. DeViedma Mot. Ex. 42.

## **PROCEDURAL HISTORY**

Devon filed this action on August 21, 2009 against Defendants DeViedma and McKesson. On November 30, 2009, we dismissed the claims against DeViedma except for the claims for (1) Breach of Fiduciary Duty by Bennett, Devon Robotics and DHS; (2) Tortious Interference with Current Contractual Relations by Devon Robotics and (3) Defamation. See Doc. 31 and 32. Then, on March 25, 2011, Devon and DeViedma stipulated to the voluntary dismissal of the Defamation claim. See Doc. No. 70.

On January 25, 2010, we dismissed the claims against McKesson except for the claims for (1) Breach of Contract and (2) Tortious Interference with Current Contractual Relations. See Doc. No. 34.

On June 20, 2011, DeViedma filed a Motion for Summary Judgment on the two remaining claims against him. McKesson also filed a Motion for Summary Judgment. Finally, Devon filed a Motion for Partial Summary Judgment against McKesson on the remaining counts with regard to liability only. See Doc. No. 85.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 535 (3d Cir. 2007); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the non-moving party cannot rely on "bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F. 3d 584, 594 (3d Cir. 2005). When the non-moving party is the plaintiff, she must "make a showing sufficient to establish the existence of [every] element essential to [her] case and on which [she] will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## DISCUSSION

## I.   JURISDICTION OVER CLAIMS AGAINST DEVIEDMA

As an initial matter, we address DeViedma's persistent arguments that the claims against him could only be brought in arbitration in Switzerland. On November 4, 2010, Devon requested arbitration in the International Court of Arbitration of the International Chamber of Commerce, located in Geneva, Switzerland, regarding the alleged material breach and subsequent unilateral termination of the i.v. Station Distribution Agreement. <u>See</u> DeViedma Mot. Ex. 44. In its request, Devon seeks to recoup over €1.3 million in product development fees it paid to HRSRL pursuant to the i.v. Station Distribution Agreement alone. <u>Id</u>. Based on a letter from an arbitrator to HRSRL and Devon Robotics on June 3, 2011, it appears that this claim is being arbitrated in Geneva. <u>See</u> DeViedma Mot. Ex. 46. Though given the opportunity, Devon does not dispute that it is arbitrating its claims with respect to the i.v. Station Agreement, an action that was filed after this Court decided DeViedma's motion to dismiss pursuant to Rule 12(b)(1). However, nothing in the record suggests that Devon has sought to arbitrate its claims against DeViedma, or any claims under the CytoCare Distribution Agreement.

Whether a particular dispute is within the class of disputes governed by an arbitration clause is a matter of federal law for

the Court to decide. GE v. Deutz AG, 270 F.3d 144, 154 (3d Cir. 2001). At the motion to dismiss stage, this Court considered the matter in accordance with the stringent standard required under Fed. R. Civ. P. 12(b)(1). In doing so, we examined evidence outside the pleadings. See Common Cause of Pa. v. Pennsylvania, 558 F.3d 249, 257 (3d Cir. 2009); Gotha v. U.S., 115 F.3d 176, 178-79 (3d Cir. 1997). After a thorough analysis, we determined that it was not proper to dismiss either claim in favor of arbitration. See Memo. at 7-13, Doc. No. 31.

Arbitration is a matter of contract. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Tech, Inc. v. Commuc'ns. Workers of Am., 475 U.S. 643, 650 (1986)(quotation omitted). Under the Federal Arbitration Act (FAA) and Pennsylvania law, a district court must compel arbitration if it finds (1) that a valid arbitration agreement exists between the parties, and (2) that the dispute before it falls within the scope of this agreement." McAlister v. Sentry Ins. Co., 958 F.2d 550, 553 (3d Cir. 1992); see 9 U.S.C. § 3.

Neither party disputes that the CytoCare and i.v. Station distribution contracts between HRSRL and Devon Robotics contain valid arbitration provisions that require "[d]isputes between the parties arising out of, in retaliation to, or in connection with this Agreement or the breach thereof" to be settled in

18

arbitration under the rules of the International Chamber of Commerce in Geneva, Switzerland. See Resp. Ex. U. Similarly, neither party disputes that DeViedma was *not* a signatory to these contracts in his individual capacity.

The presumption of arbitrability has never been extended to claims by or against non-signatories. Miron v. BDO Seidman, LLP, 342 F. Supp. 2d 324, 332 (E.D. Pa. 2004); see, e.g., Medtronic Ave Inc. v. Cordis Corp., 367 F.3d 147 (3d Cir. 2004). In fact, "exceptional circumstances must apply before a court will impose a contractual agreement to arbitrate on a non-contracting party." Id. While there are several established theories under which non-signatories may be bound to arbitrate, here in contrast, DeViedma, a non-signatory, is seeking enforcement of the arbitration clause in Devon Robotics' contract with HRSRL. As such, we concluded that "the only theory under which DeViedma may be able to enforce the arbitration clause is the alternative estoppel theory." Memo. at 10, Doc. No. 31.[7]

---

[7] Contrary to DeViedma's contention, the Court considered and rejected the applicability of the agency theory. "When asked to enforce an arbitration agreement *against a non-signatory*, we ask whether he or she is bound by that agreement under traditional principles of contract and agency law." Bel-Ray Co. v. Chemrite Ltd., 181 F.3d 435, 444 (3d Cir. 1999)(emphasis added)(citing Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503 (3d Cir. 1994). Here, however, we are asked by a non-signatory to enforce an arbitration agreement *against a signatory*.

DeViedma now claims that the present case is analogous to Pritzker v. Merrill, Lynch, Pierce, Fenner & Smith, 7 F.3d 1110 (3d Cir. 1993). In Pritzker, the relevant issue presented to the Third Circuit was "whether a signatory to an arbitration agreement could be compelled to arbitrate claims it had against the agents of the other party to the agreement." Bel-Ray, 181 F.3d at 444. The Third Circuit determined that "where the principal is bound to arbitration and the complaints arise out of the agent's conduct *on behalf of that principal*, the agent is bound by the principal's agreement to arbitrate disputes." E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber &

We revisit whether Devon must be compelled to arbitrate its claims against DeViedma, as reaching such a conclusion would deprive this Court of subject matter jurisdiction over those claims. DeViedma maintains that the fully developed and undisputed record shows the alternative estoppel theory does apply and the Court should therefore dismiss the claims against him in favor of arbitration. We disagree that the Court is compelled to invoke this extraordinary exception.

**(a) Alternative estoppel theory**

Non-signatories may have standing to compel arbitration against a signatory, thereby estopping the signatory from avoiding arbitration, "when the issues which the nonsignatory wants to resolve are intertwined with the agreement that the signatory signed." Bannett v. Hankin, 331 F. Supp. 2d 354, 359 (E.D. Pa. 2004). "This theory applies when a signatory to the written agreement must rely on the terms of the agreement to asserts its claims against the nonsignatory such that the

---

Resin Intermediates, S.A.S., 269 F.3d 187, 199 (3d Cir. 2001) (quoting Pritzker, 7 F.3d at 1122 (emphasis added)).

However, Pritzker is distinguishable from the case before us. Here, DeViedma purports that all actions he took as COO of Devon Robotics, and after his tenure in this position, were taken on behalf of HRSRL. However, this is a contentious matter, and neither of Devon's claims against DeViedma rely on his status as an agent of HRSRL. Devon presents compelling evidence that DeViedma served as a double-agent, equally acting, or purporting to act, on behalf of Devon Robotics, and that Devon's claims against DeViedma arise from his independent tortious conduct for which he is personally liable. Furthermore, in Pritzker, the signatory was compelled to arbitrate its same statutory ERISA claims against both the signatory-principal and its non-signatory agent. Given that the court was compelled to submit the matter to arbitration in regards to the signatory-principal, the court applied the agency exception to compel arbitration of the same matter in regards to the non-signatory agent of that principal.

signatory's claims make reference to or presume the existence of the written agreement, or the signatory's claims arise out of and relate directly to the written agreement." Id. at 359-60. See also E.I. Dupont, 269 F.3d at 199 (quoting Thomson-CSF, S.A. v. Am. Arbitration Ass'n., 64 F.3d 773, 779 (2d Cir. 1995)); GE v. Deutz AG, 270 F.3d at 156n.4. "The essential question in situations such as these is whether plaintiffs would have an independent right to recover against the non-signatory defendants even if the contract containing the arbitration clause were void." Miron, 342 F. Supp. 2d at 333.

**(b) Application to Breach of Fiduciary Duty Claim**

At the motion to dismiss stage, we held that the breach of fiduciary duty claim does not arise out of the various agreements between Devon Robotics and HRSRL. Even if DeViedma's role as COO was created via the Second Amendment, as DeViedma maintains, any fiduciary duty DeViedma owed to Devon is "by virtue of his position as COO and independent of any obligations he may have had under the agreements." Memo. at 12, Doc. No. 31. At the heart of Devon's claim is the contention that DeViedma entered in a fiduciary relationship with Devon, one that may have been initially prompted by the contracts with HRSRL but was not intimately founded in or intertwined with any contractual obligation. Nothing demonstrates this quite as clearly as DeViedma's assumption of the COO position, and its

responsibilities, before the Second Amendment went into effect. Thus, estoppel does not apply to compel arbitration of this claim.

## (c) Application to Tortious Interference with Contractual Relations Claim

Devon's claim against DeViedma is limited to his alleged interference with "validation agreements" held between Devon Robotics and eight different hospital customers. Through these contracts, Devon Robotics and its customers agree to the terms of a free trial of the i.v. Station robot. None of these contracts includes a binding arbitration clause; the customers are not party to the i.v. Station Distribution Agreement by virtue of signing subsequent validation agreements with HRSRL and/or Devon Robotics.[8] Devon has an independent right to recover against DeViedma if he acted alone to intentionally interfere with in Devon's contractual relations with customers, even if these validation agreements were derivative of the deal between HRSRL and Devon under the i.v. Station Distribution Agreement. Thus, estoppel does not apply to compel arbitration of this claim.

## II. DEVIEDMA'S ALLEGED FIDUCIARY DUTY TO DEVON ROBOTICS, AND BREACH THEREOF.

In Count IV, Devon alleges that DeViedma owed Devon Robotics fiduciary duties, including the duty of loyalty, which he

---

[8] As discussed further, *infra* Part IV(B), actual copies of these executed validation agreements have not been identified in the record. We base this analysis on the model contract presented, and apparently used, as a standard form.

breached. Rather than provide Devon Robotics with promised support, DeViedma, of his own volition, "began an undercover campaign to destroy Devon Robotics from the inside, deceitfully using the power bestowed on him as COO to his own advantage and to the advantage of his other employer, HRSRL." Compl. at ¶ 29, Doc. No. 5.

"To recover for a breach of fiduciary duty under Pennsylvania law, a plaintiff must prove: (1) the existence of a fiduciary relationship; (2) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of the plaintiff in all matters for which he or she was employed; (3) that the plaintiff was injured; and (4) that the defendant's failure to act solely for the benefit of the plaintiff was a real factor in causing the plaintiff's injury." Belmont v. MB Inv. Partners, Inc., 2012 U.S. Dist. LEXIS 1656 at *28 (E.D. Pa. Jan. 5, 2012)(citing Airgas, Inc. v. Cravath, Swaine & Moore, LLP, 2010 U.S. Dist. LEXIS 78162 at *4 (E.D. Pa. Aug. 3, 2010)).

### (1)  Fiduciary Relationship

"A fiduciary duty arises when the relationship between parties is one of trust and confidence such that the party in whom trust and confidence is reposed must act with scrupulous fairness and good faith in his dealing with the other and refrain from using his position to the other's detriment and his own

advantage." Prudential Ins. Co. of Am. v. Stella, 994 F. Supp. 318, 322 (E.D. Pa. 1998)(citing Young v. Kaye, 279 A.2d 759, 763 (Pa. 1971)). "Under Pennsylvania law, a fiduciary relationship does not rest on a specific association between the parties." Belmont, 2012 U.S. Dist. LEXIS 1656 at *28. A fiduciary relationship can emerge whenever the parties have "reposed a special confidence in each other to the extent that the parties do not deal with each other on equal terms." Brandow Chrysler Jeep Co. v. Datascan Techs., 511 F. Supp. 2d 529, 538-39 (E.D. Pa. 2007)(quoting In re Clark's Estate, 359 A.2d 777, 781 (Pa. 1976)). "The special confidence required of the parties can be satisfied by an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." Id.; see also eToll Inc. v. Elias/Savion Adver, 811 A.2d 10, 21-24 (Pa. Super. Ct. 2002). Additionally, an agent "is considered a fiduciary with respect to matters within the scope of his agency and is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed." Prudential Ins., 994 F. Supp. at 322; Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt., 456 Fed. Appx. 184, 190 (3d Cir. 2012).

DeViedma argues that he did not owe Devon Robotics a fiduciary duty because he was not an officer of the company. He claims that the work he did for Devon Robotics was dictated by

the Second Amendment to the CytoCare Agreement, and that under this arrangement, his "only obligations were to [his] employer, HRSRL, and [he] never believed that [he] had any direct obligations to Devon Robotics or Bennett." DeViedma Mot. Ex. 1 at ¶ 9. Rather, DeViedma portrays himself as an independent contractor, working with Devon Robotics as HRSRL's agent pursuant to the Second Amendment and acting only within this contract's scope.

The parties agree that DeViedma did not have a written employment contract with Devon Robotics at any time. See DeViedma Mot. Ex. 17 at 4. We recognize that the Second Amendment to the CytoCare Distribution Agreement created the position that DeViedma ultimately assumed at Devon Robotics. However, it is not as clear that this contract alone defined his role at the company. See Dep. of DeViedma, Resp. Ex. H at 151:12-152:20.

The Chief Financial Officer at Devon Robotics testified that DeViedma was the company's COO and the "go-to guy" who was contracted because Bennett "needed one guy to make all the decisions and be the primary focus point during that period of time." Resp. Ex. N at 225:11-21. As early as February 28, 2009, DeViedma controlled the assignments of sales territories, making changes as he saw fit. See Resp. Ex. D at Devon0113896. From March 1st to June 5th, DeViedma was responsible for hiring employees for Devon Robotics. See Resp. Ex. J at 95:20-96:6. For

25

example, on May 2, 2009, DeViedma sent an email to Devon
Robotics' employees detailing changes he had made to the sales
support team. In this correspondence, DeViedma states that he
replaced an employee, and threatens to fire or transfer employees
who likewise underperform. See Resp. Ex. D at Devon0114589-90.
DeViedma provides direction for the sales team, demonstrates his
control over the hiring, firing and management of their work, and
otherwise speaks with the authority of a supervisor with the
authority to make hiring and firing decisions based on observed
employee performance. Id. See also Resp. Ex. D at 0061861
(DeViedma announcing the promotion of a Devon Robotics'
employee). DeViedma also had the authority to sign consulting
agreements on behalf of Devon Robotics. See Resp. Ex. D at
Devon0306066.

DeViedma presented himself as, and acted with the authority
of, COO of Devon Robotics. On March 11, 2009, McKesson recognized
DeViedma's role as the COO of Devon Robotics, indicating that
Souerwine engaged in pricing negotiations with DeViedma directly
as the representative of Devon Robotics. See Resp Ex. K at
MCK041561-2. On March 21, 2009, DeViedma represented the
following to a potential customer as follows:

> I am one of the 2 architects for i.v. Station, and in addition to
> my responsibility with Health Robotics, I am also currently the
> COO of Devon Robotics, the start-up company for our robots in
> your country and I will be holding this position for at least 1
> year in order to ensure that we organize Devon in the proper
> manner and with a sound structure in America. Resp. Ex. L at
> III017_0027248-9.

26

Again, on April 8, 2009, DeViedma sent an email to a series of "valued customers" with the subject line: "Confidential—Devon Robotics COO Communication on VPN Access for CytoCare and i.v. Station." <u>See</u> Resp. Ex. D at Devon0064493.

This case presents an unusual and likely ill-advised scenario. It is questionable that DeViedma could act as an executive officer in control of Devon Robotics—brokering deals with other companies, managing the staff, holding himself out to the public as the COO—but escape any fiduciary responsibility for his actions while in this post. In fact, the Second Amendment seems a harbinger of conflicts of interest. Nevertheless, at the time DeViedma and Bennett were working toward the same goal: the success of Devon Robotics in the sale of CytoCare robots. DeViedma could have, and indeed arguably did, develop a fiduciary relationship with Devon Robotics in working toward this goal. This is a critical, disputed question of fact. The dense record contains sufficient evidence to suggest that DeViedma assumed a more entrenched role at Devon Robotics than that of a mere temporary consultant. A reasonable juror could determine that DeViedma was an officer of Devon Robotics at the relevant times given his duties and actions and developed a fiduciary relationship with Devon.

### *(2) Breach of Fiduciary Duty*

DeViedma argues that even if he owed a fiduciary duty to Devon there is no evidence that he breached this duty. Devon identifies various surreptitious actions that amount to a breach of DeViedma's fiduciary duties: (1) unreasonably and wrongfully drawing down the entire $5 million line of credit, extended by Itochu pursuant to the Guaranty Agreement, in favor of HRSRL; (2) concealing known problems with CytoCare's performance; (3) fostering personal allegiances with Devon Robotics' employees in order to later divert these employees from the company; (4) preventing Devon Robotics from having contact with any other executives or employees at HRSRL; and (5) blaming Devon Robotics for the failure of the CytoCare technology.

It remains uncertain whether HRSRL was empowered to draw down the $5 million line of credit in excess of the fees presently owed by Devon Robotics. The relevant clauses in the various, related contracts are ambiguous on this point. However, we do not concern ourselves with this potential dispute between HRSRL and Devon Robotics, which would possibly be subject to arbitration, as its resolution is immaterial to the present tort claim. Even if HRSRL was contractually permitted to draw down the line of credit in full when and how it did, the issue presented by Devon is whether it was proper for *DeViedma* to participate in and encourage such actions by HRSRL while serving in a dual role as an agent of Devon Robotics.

Evidence suggests that HRSRL acted at the direction of DeViedma, or with his considerable involvement, when deciding to draw down the $5 million Line of Credit in its entirety without awaiting the expiration of the 30-day cure period. It appears DeViedma had been acting as a mediator in an attempt to resolve disputes between Itochu and Devon. In particular, DeViedma worked to craft a revised agreement for the DHS share purchase by Itochu. It also appears DeViedma encouraged HRSRL's drawdown of the entire $5 million to corral or coerce Itochu, and Devon, into following through with this tentative deal.

On March 23, 2009, DeViedma wrote to Itochu and Devon:

> [Rabbat], below is the only LOI that I recognize which is the one you and I agreed upon at lunch last week. I understand that [Itochu] has the right to change its mind since our agreement was not binding and that is OK, but I will not be party of any more discussions with you and your company nor will I be involved in further mediation efforts...Werner will not wait anymore for this soap opera to endlessly continue, and he has given notice of Devon's material breach today...[which] gives Devon 30 days to cure the material breach with Italy for non-payment of Franchise Fees. I do hope for your company's sake that you can reach agreement with [Bennett]...over the next 30 days but for avoidance of doubt, rest assured that there shall be no extensions whatsoever to the 30-day cure period. This is not a threat, just a matter of fact. Resp. Ex. D at Devon0095096.

Devon wrote to DeViedma on March 25, 2009: "Itochu's general counsel just called and said that...the LOC was drawn today. Is this correct? I was not aware that this was going to occur this week. Can you let me know?" See Resp. Ex. D at Devon0113832. DeViedma wrote in response the same day:

> Yes...there are self-inflicted consequences to Itochu for what [O'Connell, President of MedSurg] or the [Investment Committee]

29

(in [O'Connell]'s words) has done. We had the right to pull this
for 3 weeks and I told [Rabbat] that we didn't in deference to
ongoing negotiations...When you see the letter of breach and
request to cure within 30 days...you will see that we say that if
Itochu disauthorizes [O'Connell] and goes back to the LOI [Letter
of Intent] terms agreed and settle things with Devon and breach
is remedied, then LOC money will be given back. In summary here,
in [Rabbat]'s absence the clowns left in NY...screwed up and
these are the consequences. Id.

Later that same night, DeViedma sent another email to Devon,

attaching "Legal_notice_of_material_breach_22.03.09.pdf." See

Resp. Ex. D at Devon0306074. The entire text of DeViedma's

accompanying statement follows:

As I indicated, this was caused by [O'Connell] or the IC undoing
the agreement I had with [Rabbat]. You have 30 days from notice
and not 1 hour more to reach an agreement with Itochu to cure and
for us to give back the LOC. If the situation is not remedied,
you and Itochu are going to put this on lawyers' hands and as I
said yesterday I want no part of this when lower level people at
Itochu embark themselves on an ego trip and commit 'hara-kiri' as
[O'Connell] did, feeling so good about their recent promotion to
CEO of MedSurg... Id.

DeViedma highlights evidence that suggests Devon had

proposed that HRSRL draw down the $5 million Line of Credit to

cover the overdue CytoCare licensing fees. See DeViedma Mot. Ex.

3 at 69:22-74:11, Ex. 24-25. Yet, this evidence predates

DeViedma's assumption of the COO position, and the Second

Amendment to the CytoCare Distribution Agreement. Moreover, there

is no evidence that Devon anticipated or requested a draw of the

entire $5 million because of the late payment of a few hundred

thousand dollars. We determine that there is sufficient evidence

of a breach by DeViedma such that this claim must be submitted to the fact finder.[9]

**(3) Damages**

Based on the above, a reasonable jury could determine that DeViedma was a real factor in causing Devon Robotics to be injured. In particular, DeViedma's breach may have been a substantial factor in causing the loss of downstream opportunities to Devon Robotics. However, the measure of such damage, if established, is uncertain. Quantifying Devon's damages with the requisite certainty, if Devon prevails on liability, will confront jurors with complex and extensive evidence, possibly effected by the outcome of the related arbitration before the ICC. Accordingly, it may prove preferable to bifurcate the issue of liability from the issue of damages. See Fed. R. Civ. P. 42(b); see, e.g., U.S. Gypsum Co. v. Schiavo Bros., Inc., 668 F.2d 172 (3d Cir. 1981); LNC Invs., Inc. v. First Fid. Bank, N.A., 2000 U.S. Dist. LEXIS 4653 (S.D.N.Y. Apr. 11, 2000). This would allow the Court to stay the action, if necessary, in regards to the assessment of damages pending the outcome of related arbitration in Switzerland or the outcome of Devon's

---

[9] Because this claim must be sustained given the evidence surrounding the drawdown of the $5 million line of credit, we do not present a full analysis of Devon's other grounds for breach. There are genuine issues of disputed fact in regards to the other alleged misdeeds by DeViedma while engaged in a fiduciary relationship with Devon Robotics. See DeViedma Mot. at 41-47; Devon Resp. at 23-25; DeViedma Reply at 13-18.

related litigation with Itochu and MedSurg, both of which might have bearing on the calculation of damages for this claim.

As Devon has shown sufficient evidence from which a reasonable juror could find DeViedma liable for a breach of fiduciary duty, we deny summary judgment with regard to this claim.[10]

## I.   MCKESSON'S ALLEGED BREACH OF THE NDA

Count I of the Amended Complaint alleges breach of contract by McKesson. Devon maintains that McKesson relied upon protected, confidential information to structure and quickly finalize its direct distribution agreement with HRSRL, and in doing so violated the NDA.[11]

### (a)   Breach of Contract

We acknowledge that the NDA addresses information derived from Devon Robotics, and thus does not encompass prior or general knowledge of the CytoCare robot, or information received directly from HRSRL. Furthermore, information gleaned from public events, even if Devon Robotics footed McKesson's bill, does not amount to

---

[10]   DeViedma continues to argue that this claim is barred by the "gist of the action" doctrine as his actions were entirely governed by the contractual terms of the Second Amendment to the CytoCare Distribution Agreement. "A breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded in contractual obligations." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008); see also Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 619-620 (E.D. Pa. 2010). For the reasons already discussed, *supra* Part I, we find the gist of the action doctrine does not apply to bar Devon's claim for breach of fiduciary duty.

[11]   The NDA is governed by Pennsylvania law per its explicit choice of law provision. See NDA at ¶ 12; see also Hopkins v. GNC Franchising, Inc., 288 Fed. Appx. 871, 873 (3d Cir. 2008)(outlining standard for breach of contract claims under PA law).

protectable information under the NDA. Surely, a reasonable juror
could determine that many of the examples Devon cites as
"confidential information" fall short of meeting even the broad
definition set forth in the NDA. However, contrary to McKesson's
representations, Devon has cited examples of information given to
McKesson that a reasonable juror could just as easily label
"confidential" and warranting protected status. For example,
Devon gave McKesson data on existing and prospective hospital
customers, including a list of current accounts. <u>See</u> Resp. Ex. D
at 248:13-250:4; Ex. C at Devon0048811. In particular, Bennett
and McKesson discussed meetings Bennett held with potential
clients regarding their needs and concerns. <u>See</u> Resp. Ex. E at
416:2-417:22.  Devon sent McKesson a copy of the Master System
License and Service Agreement, which Devon used with customers
and which included a confidentiality clause, along with other
documents related to CytoCare's functions that Devon itself
created. <u>See</u> Resp. Ex. C at Devon0113771-95.  McKesson
acknowledged that the company received these documents and placed
them on Shareholder. <u>See</u> Resp. Ex. G at 144:21-146:17.

The NDA does not prohibit McKesson from pursuing business
opportunities similar to the opportunity with Devon or from
marketing and developing products or programs using ideas,
concepts and information that are similar to the Confidential
Information. <u>See</u> NDA at ¶ 4. McKesson simply could not use the

33

confidential information provided by Devon for any purpose other than analyzing the deal with Devon Robotics.

Devon asserts that McKesson continued to keep information on the SharePoint website specially designed for confidential materials from Devon while structuring a deal directly with HRSRL. Sperling admits that he did not take steps to shut down the site, and does not know whether anyone else at McKesson did. Resp. Ex. G at 161:23-162:10. Sperling also indicated to McKesson employees that they could access these documents while preparing for the July 28th meeting with HRSRL. See MCK 162254. Furthermore, Souerwine acknowledges that he shared the agreement developed with Devon to serve as a framework for the direct deal with HRSRL. See Resp. Ex. X at 20:8-17.

This claim, like much of this entire action, is complicated by the conflicting roles of Gaspar DeViedma. Much of the allegedly confidential information imparted to McKesson was imparted by DeViedma during his tenure at Devon Robotics. DeViedma likewise was involved in brokering the direct deal with McKesson. Whether McKesson violated the NDA by using confidential information to structure a direct deal with DeViedma, who was also privy to, and at times supplied, this same confidential information is a material issue of fact for the fact finder. While Devon's suspicions alone would not be enough to withstand a motion for summary judgment, a reasonable juror could determine

34

based on the circumstantial and direct evidence presented by
Devon that McKesson used protected information in the rapid
execution of its direct deal with HRSRL.

### (b) Damages

To sustain a claim for breach of this contract, Devon must
show resultant damages. <u>Ware v Rodale Press, Inc.</u>, 322 F.3d 218,
225 (3d Cir. 2003)(quoting <u>Corestates Bank, N.A. v. Cutillo</u>, 723
A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Moreover, there must be a
"causal connection between the breach and the loss" to recover
the alleged damages. <u>Logan v. Mirror Printing Co. of Altoona</u>, 600
A.2d 225, 226 (Pa. Super. 1991).

McKesson asserts that there is no evidence that Devon
suffered any damages as a result of any alleged breach of the
confidentiality agreement. Mot. at 22-24. We agree that the "loss
of revenue under the McKesson-Devon Robotics agreement," which
was never consummated, cannot be the measure of damages. <u>See</u>
Compl. at ¶ 94. In its response, Devon persists: "the damages
that Devon suffered are the loss of profits from an agreement
with HRSRL, which could be measured either by the profits Devon
would have obtained from such an agreement or by the value of
such an agreement to McKesson." Resp. at 16, Doc. No. 87. As
discussed *supra* in Part II, we can bifurcate the issue of
McKesson's liability from the issue of assessing damages if the

latter requires awaiting the resolution of the ongoing arbitration in Switzerland. See Fed. R. Civ. P. 42(b).

For the reasons discussed, we deny McKesson's motion for summary judgment as to the claim for breach of contract.

## II.   TORTIOUS INTERFERENCE WITH CURRENT CONTRACTUAL RELATIONS

Under Pennsylvania law, in order to prove tortious interference with existing contractual relations, a plaintiff must prove the following: (1) existence of a contractual relation between the claimant and a third party; (2) purposeful action on the part of the defendant specifically intended to harm the existing relation; (3) the absence of a privilege or justification for doing so; and (4) actual legal damage as a result of defendant's conduct. Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 212 (3d Cir. 2009); Blackwell v. Eskin, 916 A.2d 1123, 1127-28 (Pa. Super. Ct. 2007). "Of these elements, the one of threshold importance is intent." Prudential In. Co. of Am., 994 F. Supp. at 322. It is not enough for a plaintiff to show merely that defendant's actions had the incidental consequence of affecting plaintiff's business relationships with third persons. Id. "A plaintiff must show that the defendant acted for the malevolent purpose of interfering with the plaintiff's existing...business relationships." Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc., 28 F. Supp. 2d 947, 951 (E.D. Pa. 1998).

36

**(A) *Claim Against McKesson***

In Count II, Devon asserts that McKesson improperly interfered with Devon Robotics' CytoCare Distribution Agreement with HRSRL by arranging to have this contract terminated prematurely.[12] This is the only contractual relationship at issue.[13] Based on the record before us, no reasonable juror could conclude that McKesson had the requisite intent to interfere with Devon's contractual relationship with HRSRL.

There is no evidence that McKesson approached HRSRL about a direct deal or otherwise acted to prompt HRSRL to terminate its CytoCare Distribution Agreement with Devon Robotics. On the contrary, the record reveals that HRSRL had sent two notices to Devon Robotics warning of a material breach and demanding a timely cure. Bennett himself testified that McKesson did not do anything to bring about the First Notice of Legal Breach. McKesson Mot. Ex. A-4, at 445:6-9. There is no evidence that McKesson did anything to bring about the Second Notice of Legal Breach, sent from HRSRL to Devon Robotics on June 8, 2009.

---

[12] Devon put forth a second basis for its claim: McKesson improperly used confidential information obtained during the due diligence period, and protected under the NDA, to structure a deal between itself and HRSRL and to divert Devon Robotics' customers. See Am. Compl. ¶96. However, Devon has merely dressed its breach of contract claim in a different outfit. The claim fails for the reasons discussed *infra*. Moreover, even if there remained a viable breach of contract claim, Devon is barred by the gist of the action doctrine from proceeding with this ground for their tortious interference with contractual relations claim. See Erie Ins. Exchange v. Abbott Furnace Co., 972 A.2d 1232, 1238-39 (Pa. Super. Ct. 2009); Bash v. Bell Tel. Co., 601 A.2d 825, 829 (Pa. Super. Ct. 1992).

[13] This Court previously dismissed Devon's claims regarding prospective contractual relations. See Doc. Nos. 31, 32, and 34. See also *infra* note 15.

Souerwine admits that in early July 2009 DeViedma approached him about a deal for CytoCare between McKesson and HRSRL directly. See Resp. Ex. Q at 274:1-20. On July 13, 2009, DeViedma wrote to alert McKesson of the lawsuits Devon Robotics was involved in and to inform McKesson that HRSRL intended to terminate the CytoCare Distribution Agreement "at some point in the short future" because Bennett was "totally reckless." See Resp. Ex. H at GDV000799. On July 14, 2009, Souerwine responded on behalf of McKesson:

> What a terrible situation and clearly disappointing (to you and to me). McKesson and I certainly don't do everything perfectly, but I'd like to think that we operate with a clear, consistent, ethical standard. This kind of stuff is just sickening when it happens. We are still not in the position to take on your software product and do it justice. We ARE in a position to pick up sales and all support of the robots right away, and I would like to proceed with [HRSRL] on this when the smoke clears a bit. In the interim, I will not pursue an agreement with Devon or have further negotiations with John and/or Barry. Please reconnect with me when you think the timing is right to pursue an alternative relationship. Resp. Ex. M at GDVOOO798-99.

This email is the only shred of evidence Devon cites as an indicator of McKesson's alleged intent to interfere. We do not see how any reasonable juror could arrive at that conclusion.

Rather, this email is one of several that demonstrate how McKesson acted cautiously so as not to engage in negotiations with HRSRL directly until *after* HRSRL terminated Devon Robotics' CytoCare Distribution Agreement. See also Email from Souerwine to McKesson staff members (7/15/2009), Resp. Ex. A at MCK145385, Doc. No. 87 ("The meeting is contingent on [HRSRL] terminating

their agreement with Devon. If the meeting can't occur for this
reason, or something else changes then I will let you know");
Email from Souerwine to DeViedma (7/15/2009), Id. ("Obviously, we
should not proceed with the meeting unless the agreement between
[HRSRL] and the various Devon entities has been terminated").

On July 17, 2009, DeViedma told Souerwine: "I can confirm
the meeting on Tuesday July 28th from 12 to 4PM and I can also
confirm that there will be no conflicts of interests at that
time..." Id. at MCK162255-56. Around July 21, 2009, Souerwine
wrote again to DeViedma:

> Is there any 'documentation' or other assurances that you could
> provide that confirm that agreements between [HRSRL] and the
> various Devon entities have been terminated, primarily the
> distribution agreement? We read in the various public legal
> pleadings that agreements had already been terminated, yet I note
> from your messages that you feel these terminations are in
> process now. I am seeking clarification so that we don't meet
> prematurely during a time when we may be getting ahead of
> ourselves. McKesson Mot. Ex. C-12 at MCK177886.

> DeViedma responded:

> For a number of reasons I cannot give you a copy or proof of
> termination of distribution agreement now. I will show it to you
> before the meeting if you wish but I will have to think about
> when you can have a copy of it. That is about as much as I can
> do. *You have my personal assurances that we are not getting ahead
> of ourselves*. Id. (emphasis added).

McKesson met with principals of HRSRL on July 28, 2009 in
Balzano, Italy and reached "an agreement on all key terms and
conditions to be the exclusive U.S. and Canada distributor for
CytoCare." Resp. Ex. K at MCK046379-81. Whether the CytoCare
Distribution Agreement was in fact terminated prior to this

39

meeting has no bearing on our conclusion. There is no evidence to support Devon's bald contention that McKesson knew the contract was in effect and maliciously sought to undermine it.

Devon does not dispute that DeViedma told McKesson the contract had been terminated, or that HRSRL had sent a termination letter to Devon Robotics on July 25, 2009. Rather, Devon argues that McKesson should have investigated more into whether the contract had in fact been terminated before meeting with HRSRL. This argument blindly sidesteps the core issue: McKesson cannot be said to harbor the intent to harm Devon Robotics when McKesson acted upon a reasonable good faith belief that the CytoCare Distribution Agreement had been terminated. See Singleton v. HGO Servs., Inc., 2001 U.S. Dist. LEXIS 22415 at *23 (E.D. Pa. Nov. 15, 2001); Schmidt, Long & Assocs., Inc. v. Aetna U.S. Healthcare, Inc., 2001 U.S. Dist. LEXIS 10709 at *10 (E.D. Pa. July 26, 2001).

Executing a final agreement with McKesson might have salvaged Devon Robotics' imperiled CytoCare Distribution Agreement. Yet, McKesson was not obligated to enter into a contractual relationship with Devon Robotics. McKesson's decision not to pursue the deal, after finding out about Devon's undisclosed and related pending litigation, cannot reasonably be interpreted as a purposeful action to interfere with the already depreciating relationship between HRSRL and Devon Robotics. Nor

40

can McKesson's offer to involve itself with HRSRL if and when
HRSRL chose to terminate Devon's contract for Devon's own
failings under its terms. There must be some genuine dispute as
to whether McKesson acted with the *intent* to harm Devon Robotics'
relationship with HRSRL. Devon has failed to present evidence
that McKesson engaged in purposeful action specifically intended
to interfere with the CytoCare Distribution Agreement.[14] Because
Devon has not produced evidence to support the necessary element
of intent, we grant summary judgment in favor of Defendant
McKesson and dismiss this claim. Accordingly, we deny Plaintiffs'
Motion for Summary Judgment as to this claim for the same reason.

### (B) Claim Against DeViedma

In Count V, Devon Robotics claims that DeViedma purposefully
interfered—without justification and for his own benefit—with
several validation contracts it held with different hospitals,
and that as a result, Devon Robotics lost substantial amounts of
business.[15] See Am. Compl. at ¶¶ 115-116. This claim is based on

---

[14] We note that McKesson maintains that it has made no profits on the sale of
CytoCare robots and is engaged in litigation against HRSRL for fraudulent
inducement, seeking equitable rescission of its contract and restitution. See
McKesson Corp. et al. v. Health Robotics S.R.L. (N.D. Cal. Civ. Action No. 11-
728-JCS)(filed under seal).

[15]    We previously dismissed Devon Health (DHS) and Bennett's claims of
tortious interference with current contractual relations because the facts
alleged in the Complaint pertained only to contracts held by Devon Robotics
alone. See Doc. 31 at 17. We also dismissed all claims of tortious
interference with prospective contractual relations, but granted Plaintiffs
leave to amend their Complaint to include claims related to the McKesson
negotiations. However, Devon did not do so.
    Nevertheless, Devon continues to include reference to the McKesson deal
when discussing the tortious interference with contractual relations claim.
See Resp. at 24 (stating DeViedma wrongfully interfered with Devon's contract
"most importantly, by hindering the progress of negotiations with McKesson");

three alleged actions by DeViedma, all of which interfered with
Devon's ability to perform its contractual obligations: (1)
disseminating false information to customers, (2) encouraging and
soliciting Devon Robotics' employees to leave their employment,
and (3) intentionally failing to properly train support personnel
while serving as COO.[16]

A "validation agreement" was a contract that allowed
potential customers the opportunity for a "standard test" of the
i.v. Station robot. See "i.v. Station Distribution Agreement,"
DeViedma Mot. Ex. 4 at § 1.48. At the end of the "validation

---

Resp. at 14n.57 (providing examples of how "[d]iscovery has already captured
the allegations of interference with the prospective contractual relationship
with McKesson" and stating that "Plaintiffs expect to file a motion to amend
their Complaint to reflect what discovery has revealed to all parties: that
DeViedma also interfered with Devon Robotics' prospective contractual
relationship with McKesson"). While such allegations may have bearing on the
breach of fiduciary duty claim, they cannot support the claim against DeViedma
for tortious interference with <u>current</u> contractual relations.

[16]    DeViedma argues that the duties he allegedly breached were not imposed
as a matter of social policy, but rather flowed directly from the non-
competition language in the i.v. Station Distribution Agreement. In making
this argument, DeViedma relies predominately on <u>Chemtech Int'l, Inc. v. Chem.
Injection Techns., Inc.</u>, 170 Fed. Appx. 805 (3d Cir. 2006). In <u>Chemtech</u>, a
company merely informed a distributor that it regrettably intended to seek out
additional distributors in the region rather than continue relying exclusively
on the existing distributor's services. <u>Id</u>. at 806. The Third Circuit affirmed
the dismissal of a tortious interference claim because the distributor did
"not have a right to be free from competition and [the company] has no duty
'imposed by law as a matter of social policy' not to compete...Only a contract
can confer such a right and impose such a duty." <u>Id</u>. at 809.
     The i.v. Station Distribution Agreement includes a non-compete provision
that confers such a duty on DeViedma when acting as HRSRL's agent. But, Devon
does not seek to hold DeViedma accountable for breaching this non-compete
provision. Rather, in contrast to <u>Chemtech</u>, DeViedma did more than declare his
intent to compete with Devon Robotics' customers; DeViedma allegedly took
deliberate steps, including dispelling false information, to harm Devon
Robotics' relationships with these customers and thereby endanger the
validation agreements. Such conduct, if true, is tortious even in the absence
of any contract forbidding such behavior. Thus, the gist of the action
doctrine does not operate to bar Devon's claim for tortious interference. <u>See</u>
<u>supra</u> note 10.

period," the test hospital could optionally, and at its sole discretion, elect to rent or purchase the i.v. Station robot. Id.

The parties fail to identify the location of the allegedly executed validation contracts in the voluminous record submitted to the Court.[17] Yet, Schedule 9 of the i.v. Station Distribution Agreement contains a model "Validation Program Agreement." Under the proposed terms, the validation agreement provides customers with a "one-time opportunity to elect to return" the i.v. Station robot before the expiration of the validation period, at no cost to the customer. Id. at Sch. 9, ¶ 4. Moreover, the "customer shall have no purchase price, rental fee, or support fee payment obligations" if the customer elects to return the product. Id. If the customer elects to retain the robot, then the customer must enter into a separate "Master Rental/Purchase Agreement," at which point customer payment obligations begin. Id.

On September 17, 2009, HRSRL sent a letter to Devon Robotics' general counsel that stated, *inter alia*:

---

[17] Circumstantial evidence of these validation contracts exists in the record. See Email from counsel for Allegiance Health (Sept. 30, 2009) Resp. Ex. D at Devon0268405-11 (terminating its validation agreement, among others); Letter from Duke Univ. Health System ("DUHS")to HRSRL and Devon Robotics (Oct. 7, 2009), Id. at Devon0330522 (having been "advised of the existence of a legal dispute between your companies with respect to the distribution of the i.v. Station device...and [Devon's] threatening legal action if DUHS were to enter into a new agreement with [HRSRL]...DUHS has determined that it is neither bound by nor prepared to enter into any agreement with respect to validation of the i.v. Station device at this time."); Email from Univ. of Colorado Hospital (Oct. 15, 2009), Id. at Devon0279405 (terminating validation agreement); Letter from counsel for Brigham & Women's Hospital ("BWH")(Oct. 23, 2009), Id. at Devon0269470 (intending to seek another vendor to service robotic devices); Letter from Oschner Clinic Foundation (Nov. 17, 2009), Id. at Devon0268696 (terminating validation agreement "for failure to deliver and install timely the validation product.").

> As you are aware, as of yesterday all of the Devon-Health
> Robotics Distribution agreements have been irrevocably terminated
> for cause, including all robots and all territories in question.
> As far as the i.v. Station termination notice, and for avoidance
> of doubt, this means also that the 9 non-monetary-value
> validation agreements are also terminated as well as the
> subsequent assignments to Devon. Thus, all of the customer
> validation contracts signed are no longer in existence. Mr.
> DeViedma will shortly inform the customers that all of their
> signed validation contracts are null and void. Finally the unpaid
> Devon purchase order for the hardware for the 9 validation
> contracts that was sent to Italy AFTER Devon initially breached
> the contract has been cancelled without charge to Devon. Resp.
> Ex. D at Devon0331101.

On September 30, 2009, Devon Robotics sent a response in which it asserted that the eight validation agreements assigned to Devon Robotics "remain in full force and effect" and that HRSRL had no right to terminate or otherwise interfere with them. Id. at Devon0247478. It appears that most, if not all, of Devon Robotics' hospital customers terminated their validation agreements in the following months.

Assuming *arguendo* that DeViedma took purposeful, unjustified action to harm Devon's relationship with customers who held validation agreements, Devon Robotics still must show that it sustained <u>actual</u> <u>legal</u> <u>damage</u> as a result. See <u>Acumed</u>, 561 F.3d at 212; <u>Blackwell</u>, 916 A.2d at 1127-28. Even if Devon can establish that HRSRL would not have terminated the validation agreements *but for* DeViedma's tortious behavior, the injury resulting from the termination of the validation contracts has not been substantiated. Taken in the best light, Devon has shown the potential that DeViedma interfered with its ability to

44

demonstrate i.v. Station to customers during the validation period but has failed to show what injury from that amounts to damages for the fact finder.

The validation contracts had no monetary value; rather, they governed a free trial of the robot unit. The customer could opt to return the robot and refuse further involvement with Devon Robotics at any time before the expiration date, for any reason and without incurring any costs. Devon cannot measure the damages from the termination of the existing validation contracts by assessing the potential value of prospective, future agreements that it anticipated would naturally emerge after the trial period. Devon attempted, and failed, to bring this exact cause of action earlier in this case.

At the motion to dismiss stage, this Court determined:

> Plaintiff's claim for tortious interference with prospective contractual relations is dismissed to the extent that the claim is based on the validation contracts...[A] claim of tortious interference with prospective contractual relations requires a showing of the existence of prospective contracts. Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1014 (3d Cir. 1993). In determining whether there is a prospective contractual relationship in a tortious interference case, Pennsylvania courts consider whether the evidence supports a finding that there was a reasonable likelihood that the contemplated contract would have materialized absent the defendant's interference. Glenn v. Point Park Coll., 272 A.2d 895, 888-99 (Pa. 1971). Additionally, a plaintiff must base its claim that there was a prospective contractual relationship on something other than an existing or current relationship. Phillips v. Selig, 959 A.2d 420, 429 (Pa. Super. Ct. 2008). Plaintiffs have based their claim solely on the existence of various validation contracts. They offer no evidence regarding any potential contracts which were interfered with by DeViedma. Memo. at 18-19, Doc. No. 31.

To the extent that Devon argues its injury was the loss of the prospective contracts that might have flowed from the validation agreements, Devon is attempting to shoehorn a claim that was dismissed into the claim that still remains. A claim against DeViedma for tortiuously interfering with contracts beyond the non-monetary validation agreements, and thereby causing the loss of these opportunities, was not properly pled in the Amended Complaint.[18]

The only evidence of actual damage from DeViedma's interference with the validation agreements impermissibly presupposes prospective contracts; Devon provides no identifiable evidence of other damages pertaining to the termination of the validation agreements or its relations with the various hospital customers. Thus, Devon cannot support this claim and we grant summary judgment in favor of DeViedma.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motions and denies Plaintiffs' Motion with respect to the claims for Tortious Interference with Current Contractual Relations and dismisses these claims. The Court denies Defendant DeViedma's

---

[18] To the extent Devon attempts to hold DeViedma accountable, as an agent of HRSRL, for participating in the wrongful termination of the i.v. Station Distribution Agreement, such arguments must be brought before the ICC in the pending, compulsory arbitration between Devon Robotics and HRSRL in reference to this specific contract. As we have already recognized, this Court lacks jurisdiction to evaluate whether HRSRL properly terminated the i.v. Station Distribution Agreement, as this matter is subject to, and undergoing, mandatory and binding arbitration in the ICC.

Motion with respect to the claim for Breach of Fiduciary Duty and denies Defendant McKesson's Motion with respect to the claim for Breach of Contract. An order follows.